UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JOSEFINA CESARMAN,

**23-CV-4441**

Plaintiff,

**COMPLAINT**

CAYUGA CAPITAL MANAGEMENT, INC.,
JAMIE WISEMAN, JACOB SACKS, JOHN
LITHEN, ZACHARY RICHARD GUMPEL,
JS-JW CONSTRUCTION FACILITY LLC,
and CCMAI 28 HERBERT LLC

**JURY TRIAL REQUESTED**

Defendant.

-------------------------------------------------------------x

## COMPLAINT

Plaintiff, Josefina Cesarman ("Cesarman" or "Plaintiff"), who resides at Sierra Vertientes 349, Apt. 101, Mexico City DF 11000, Mexico, by and through her counsel, Norris Mclaughlin, P.A., as and for a Complaint against Cayuga Capital Management, LLC ("Cayuga"), a New Mexico Limited Liability Company, having a registered office located at 97 North 10th Street, 2d, Brooklyn, New York 11249, Jamie Wiseman ("Wiseman"), Jacob Sacks ("Sacks"), John Lithen ("Lithen"), Zachary Richard Gumpel ("Gumpel"), individuals residing in the State of New York, JS-JW Construction Facility LLC ("JS-JW"), a New York Limited Liability Company, having a registered office located at 97 N 10th Street, 2D, Brooklyn, New York 11249, and 28 CCMAI HERBERT LLC ("CCMAI"), a New York Limited Liability Company, having a registered office c/o Cayuga Capital Management, LLC, 40 Wall Street, Suite 2098, New York, New York 1000, hereby alleges as follows:

**<u>NATURE OF CLAIMS</u>**

1.      Plaintiff brings this lawsuit to recover for the losses she sustained as a result of a fraudulent scheme orchestrated by Defendants in connection with investments in two properties located in Brooklyn, New York. Defendants, who developed a relationship of trust and confidence with Plaintiff by holding themselves out as investment advisors, induced Plaintiff, who was 80 years old at the time, to invest nearly $1 million towards properties Defendants falsely claimed to own, control, or manage.

2.      Because of Defendants' representations about their skill and knowledge, Plaintiff relied on them to conduct the necessary due diligence and select the investment matching her desired parameters: which called for  a conservative, passive, and income-producing equity stake in real estate. Instead, Defendants, who claimed to conduct due diligence on each investment, failed to advise Plaintiff of material facts that affected the risk of each investment, failed to keep Plaintiff fully informed as to the status of her investments, and otherwise breached fiduciary duties they owed to Plaintiff, as set forth in detail below.

3.      The first investment Defendants recommended was in the form of a $300,000 purchase of a membership interest in connection with Defendants' alleged construction and development of a mixed-use property to be located at 28 Herbert Street, Brooklyn, NY. Even though Defendants claimed that Plaintiff was investing in the entity that had a "joint venture" with the owner of the property, the membership interest Defendants sold to Plaintiff had no relationship with the property owner at all.

4.      The second investment that Defendants recommended was a $700,000 loan, which is now in default. In connection with this investment, Defendants led Plaintiff to believe that they

owned the subject property and that Plaintiff's loan would be secured by the property. Both representations were false.

5.     After Plaintiff invested this substantial sum, Defendants made some payments on the loan, but then failed to pay when the subject note became due. An event of default was declared but not remedied.

6.     As a result, Plaintiff seeks recision of the agreements she was fraudulently induced to enter, return of all the monies she paid to Defendants, and reimbursement of her legal fees and costs incurred in this matter.

## JURSDICTION AND VENUE

7.     This Court has jurisdiction, pursuant to 28 U.S.C. §1332, over this matter due to diversity of citizenship, as Plaintiff is a citizen and resident of the Country of Mexico, while Defendants are domiciled in, reside in, or are employed in the State of New York and the amount in controversy is in excess of $75,000.00.

8.     The Court also has federal question jurisdiction under 28 U.S.C. §1331(a) over certain claims, as those claims are based upon violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq*.

9.     The remaining causes of action are appropriate pursuant to 28 U.S.C. § 1367 for interrelated state law claims that arise from the occurrences giving rise to the federal claims, which have a common nucleus of operative fact.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the acts complained of arise from acts performed in this District or because the subject matter property of this action is located in this District and because one the parties' loan agreements selected this venue for the resolution of disputes.

## PARTIES

11.     Plaintiff is a resident and citizen of the Country of Mexico, residing at Sierra Vertientes 349-1, Mexico City, Mexico 11000.

12.     Defendant Cayuga Capital Management LLC ("Cayuga") holds itself out as a real estate investment adviser and a "real estate operating partner, developer, and property manager with over $800,000,000 in operating and development properties under management" development firm. It is registered with the New York Secretary of State as a foreign Limited Liability Company formed under the laws of New Mexico, with a mailing address of 97 North 10th St. 2D, Brooklyn, NY 11249

13.     Defendant Wiseman is one of principals of Cayuga and maintains a principal place of business in New York, New York.

14.     Defendant Lithen is one of principals of Cayuga and maintains a principal place of business in New York, New York.

15.     Defendant Sacks is one of principals of Cayuga and maintains a principal place of business in New York, New York.

16.     Defendant CCMAI is a New York Limited Liability Company which, on information and belief, maintains a principal place of business in New York, New York, with a mailing address of 217 Havemeyer Street, 4th Floor, Brooklyn, 11211.

17.     Defendant JS-JW is a New York Limited Liability Company which, on information and belief, maintains a principal place of business in New York, New York.

18.     Defendants Cayuga, Lithen, Sacks, CCMAI, and JS-JW are sometimes referred to as the "Cayuga Defendants."

19.     Defendant Gumpel is or was a citizen of the State of New York, who, at the time of the incidents complained of herein, maintained an address at 803 Wyckoff Ave., Unit 4L, Ridgewood, New York, 11385.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

*Gumpel's Advice, Retention, and Introduction to Cayuga as an Investment Advisor*

20.     At the time the events occurred, Plaintiff was an 80-year-old widow and a resident of the Country of Mexico.

21.     Plaintiff does not have any special education in money management, and in the past, her finances were managed by her husband, who is now deceased.

22.     Plaintiff did, however, inherit some money, which is managed by a personal financial advisor. That financial advisor encouraged Plaintiff to "diversify" her investments and to make a conservative investment into real estate to generate income for her retirement.

23.     To that end, on or about Oct. 18, 2018, Plaintiff, with the assistance of her son, Marlon Maus ("Maus"), who resides in California, reached out to defendant Gumpel, whom Plaintiff knew to be a real estate agent.

24.     Plaintiff knew Gumpel because he had assisted Plaintiff's deceased husband with his real estate dealings.

25.     When seeking Gumpel's advice, Plaintiff stressed that she was looking to purchase an equity stake in New York real estate with minimal risk, given her advanced age.

26.     She also indicated that she did not want to deal directly with any potential tenants, and was looking for a hands-off, or passive, investment.

27.     Gumpel represented to Plaintiff and Maus that he had extensive expertise in investing in New York real estate and would locate investment "deals" that may be of interest to Plaintiff and suited to her investment parameters.

28.     The arrangement that Gumpel proposed to Plaintiff required her to pay a significant "capital placement fee" in exchange for Gumpel's services as *Plaintiff's agent* in connection with "locating" real estate "deals" and investing Plaintiff's capital.

29.     Relying on Gumpel's representation of his skill and experience, as well as his representation that he would serve as Plaintiff's agent and adviser, Plaintiff agreed to retain Gumpel's services. Indeed, on numerous occasions, Gumpel assured Plaintiff that he was acting as her agent and with her best interests in mind.

30.     However, Gumpel does not possess any licensure as a personal investment advisor.

31.     Plaintiff was willing to pay a significant fee to Gumpel because he represented himself as an individual with particularized knowledge and expertise in real estate investment. Gumpel further represented that he would locate deals commensurate with the investment parameters identified by Plaintiff. However, he did not.

32.     Thus, on or about Oct. 27, 2018, Gumpel forwarded to Plaintiff and her son a contract for Gumpel's "Private Placement of Capital" services.

33.     On that day, Gumpel also introduced Plaintiff to the Cayuga Defendants.

34.     Gumpel introduced Plaintiff and Maus to Cayuga though its principals, Sacks, Lithen, and Wiseman, who were, and, on information and belief, remain principals of Cayuga.

35.     During the introduction, Gumpel assured Plaintiff that Cayuga was the right investment opportunity for Plaintiff given her investment needs.

36.     In fact, in an email dated Dec. 6, 2018, Gumpel expressly stated, "I'm acting as your placement agent with your best interests, not on behalf of the company[…]"

37.     Consequently, on or about Dec. 6, 2018, "Zachary R. Gumpel Independent Consulting" issued an invoice to Plaintiff in the amount of $20,000.00 as a "Capital Placement Fee" for a job described as "Capital Placement." Exhibit A

38.     Gumpel does hold a New York State Limited Liability Company Broker real estate license. Exhibit B

39.     On or about Dec. 7, 2018, Gumpel wrote to Plaintiff pressuring her for payment of his fees:

> "Typically, I don't make the formal intro until my fee has been paid for my protection. Furthermore, I usually do 3%, 1% from the client and 2% from the firm with whom I've placed. I've known you for a long time so I didn't want you to pay anything out of pocket. I'm getting a little nervous here as to what's the hold up is.  The deal with CCM [Cayuga] May begin as early as next week and then I'll be out of the loop...."

40.     At Gumpel's urging, Plaintiff paid Gumpel's fees, but did not receive a rebate from Cayuga despite the express promise of such rebate.

41.     Then, again relying on Gumpel's representations, Plaintiff agreed to enter into a second agreement with Gumpel, this one titled a "Private Placement of Capital" agreement with Gumpel on or about Oct. 25, 2019. Exhibit C.

42.      That agreement was likewise related to Gumpel's locating of "deals" with the Cayuga defendants.

43.     The Private Placement of Capital letter from Gumpel provides that it seeks to confirm the "understanding that you [Plaintiff] have engaged [Gumpel] to act as a placement agent on your behalf in connection with a best-efforts private placement."

44.     The law imposes on Gumpel, as an agent, a duty of care and loyalty to Plaintiff.

45.     The Private Placement of Capital letter further provided that:

In connection with the Placement Agent's activities hereunder, the Company (CCM) [Cayuga] furnished all material and information regarding the business and financial conditions of the (the "information") Zachary R. Gumpel represents and warrants that all Information provided will be complete and correct in all material will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading.

46.     As compensation for Gumpel's "private placement of capital," Plaintiff agreed to pay him $10,000.00, and that fee fee was to be rebated back to Plaintiff by Cayuga once Plaintiff invested.

*Cayuga Defendants Hold Themselves out As Real Estate Financial Advisors and Develop a Relationship of Trust and Confidence with Plaintiff*

47.     When Gumpel introduced Plaintiff to the Cayuga Defendants, both Gumpel and Cayuga represented that Cayuga was an experienced real estate investor, developer, and manager.

48.     Shortly after the introduction by Gumpel, Cayuga provided Plaintiff with numerous materials regarding its principals, investment expertise, and development projects.

49.     Through its written materials and in communications with Plaintiff, Cayuga held itself out as an investment advisor with particular expertise in real estate. A true and accurate copy of those written materials in attached hereto as Exhibit D

50.     Sacks, Wisemen, and Lithen represented that Cayuga was a real estate development firm then based in Brooklyn, New York, *which owned numerous units of real estate.* More specifically, they represented that Cayuga owned over 450 apartment units and hundreds of thousands of square feet of commercial real estate in Brooklyn. In fact, Cayuga expressly represented – and continues to do so on its website – that it is "one of the largest residential property owners in Bushwick."

51.     During the following months, Maus (on behalf of Plaintiff) had multiple phone and e-mail communications with Gumpel, Sacks, Wisemen, and Lithen, who introduced him to multiple projects that might be of interest to Plaintiff, which Maus passed on to his mother. Maus has no familiarity with real estate investments, and acted strictly as a convenient go-between for Cayuga and Plaintiff when necessary.

52.     At all times material hereto, Gumpel, Sacks, Wiseman, Lithen, and Cayuga were aware of the parameters of Plaintiff's investment goals  to take an equity position in real estate or to loan funds that were not subject to any significant risk of non-payment.

53.     Cayuga provided Plaintiff with materials regarding the firm, which are attached hereto as Exhibit D. In those materials, Cayuga identified its "**Investment Thesis"** as follows:

[Cayuga] seeks to identify properties not operated at their best and highest potential and invests to maximize returns. [Cayuga] achieves this through repositioning the property, renovation, or ground up construction.

54.     Cayuga also claimed that it is a "significant real estate holder in Brooklyn, New York, helping transform and grow the neighborhood for over a decade. [Cayuga] currently owns approximately 450 apartment units and almost 450,000 SF of commercial space in Brooklyn,

making it one of the largest commercial developers in Williamsburg and one of the largest residential property managers in Bushwick."

55.     As far as its principals, Cayuga asserted that Sacks and Wiseman, together, have "over 32 years of experience in private equity law, investment banking, hedge fund administration, and private equity investment into real estate."

56.     Upon information and belief, Wiseman is an attorney licensed to practice law in this state.  Cayuga's materials expressly highlight his experience in "private equity law."

57.     Cayuga also represented that it maintained a unique "investment Process," and that its "excellent risk-adjusted returns are based on a disciplined and proven investment process in which the firm: […] mobilizes its in-house acquisition and development team to structure, design, and optimize each investment."

58.     Cayuga represented that it **creates value for its clients through various** "tax strategies," "repositioning," and "new development."

59.     Cayuga claimed that its "partners invest their own capital into each deal alongside their investor's, providing long-term alignment of interest."

60.     With respect to Lithen, Cayuga's head of acquisitions, Cayuga claimed that he is responsible for acquisition, sourcing, and underwriting, due diligence, transaction execution and deal capitalization."

61.     Cayuga also employs a "Head of Investor Relations" who is marketed as being responsible for "providing reporting and support to [Cayuga's] investors."

62.     As a result of Cayuga's holding itself out as an experienced investment adviser and highlighting the skill of its principals, and as a result of Gumpel's endorsement of Cayuga, Plaintiff

trusted that Cayuga would select the correct investments for her. Accordingly, Plaintiff agreed to invest with Cayuga Defendants and purchase shares in their "real estate" portfolio.

63.     Thus, between January and May of 2019, Plaintiff had numerous calls and email exchanges with Cayuga and Gumpel regarding various projects Cayuga recommended for investment.

64.     Throughout that time, Cayuga continued to offer Plaintiff investment advice and recommendations with respect to Plaintiff's investment goals.

65.     By way of example and not limitation, on or about May 18, 2019, Lithen wrote to Plaintiff with respect to two investment opportunities, stating:

> "In consideration of what we discussed [Cayuga] can offer an investment of up on 500K in Junius Street. […] We are very excited about this deal because of the low basis and unique upside. Urban industrial assets should continue to perform quite well and the potential to rezone down the line can add tremendous value long term."

66.     In addition, a significant factor as to why Plaintiff was interested in pursuing an investment with Cayuga was that Cayuga expressly represented that it **owned** the properties in which Plaintiff was to invest. That representation was a material consideration for Plaintiff, as Cayuga was represented to own a large number of apartment units and was experienced in investing, owning, and managing properties in New York.

67.     In addition, Cayuga caused Plaintiff to believe she would be investing into an equity position in the development.

68.     Plaintiff would not have invested if she had known that her investment was not into an entity that actually controlled or owned the subject property.

69.     Furthermore, Plaintiff would not have invested with Cayuga if it had not held itself out as an advisor with a particular expertise in real estate investing on behalf of clients, whose advisors engage in the appropriate "due diligence" with respect to the investment.

70.     Among the properties that were presented to Plaintiff as investment opportunities were two properties at issue here: (a) an unoccupied building located at 28 Herbert St., Brooklyn, New York (the "Herbert Property"), which was to be developed into a mixed-use development; and (b) a tenanted, mixed-use commercial/ residential property located at 787-795 Wyckoff Avenue, Brooklyn, New York ( the "Wyckoff Property"),.

71.     As will be set forth in more detail below, Plaintiff ultimately invested in these two properties based on numerous false representations and omissions by the Defendants here.

*Plaintiff's Investment in CCMAI 28 Herbert LLC*

72.     On or about May 18, 2019, Lithen introduced Plaintiff to a project referred to as 28 Herbert Street.

73.     When Plaintiff asked what Lithen would "recommend in terms of investment in Herbert Street[,]" Lithen responded as follows:

As for Herbert Street, we can accommodate the remaining 500K or any number up to 500K. Investing in Brooklyn multifamily (especially Williamsburg) provides long term security as demand for this product will always remain strong. Also, property taxes will be protected for 35 years."

74.     She was further advised that Cayuga was "finalizing a joint venture with the current landowner and should have the site under control within weeks."

75.     Even though Lithen represented 28 Herbert as a "secure," "long-term" investment, and referred to tax protection for 35 years, he failed to disclose that the entity in which Plaintiff

was investing was not, in fact, the entity that would be engaged in any "joint venture" with the property owner.

76.    Lithen also failed to disclose that there was no joint venture agreement, but rather Cayuga Defendants were negotiating a ground lease with respect to the property, which ground lease *could potentially convert to a Joint Venture* upon the happening of a specific condition, namely, the completion of construction of the property.

77.    These facts, which were concealed from Plaintiff, materially affected the risk and the desirability of the subject investment.

78.    Although Plaintiff sought to invest in another opportunity, known as 144 Greenpoint Development, Cayuga claimed that opportunity was no longer available and steered Plaintiff towards 28 Herbert Street.

79.    Plaintiff consulted with Gumpel concerning this issue, and he advised:

"I do have thoughts yes, would love to share. A little frustrating they couldn't get you fully into the original deal...... sometimes the bigger investors get priority..... but honestly it's all very fortuitous, positive on all sides."

80.    Gumpel, just like Lithen, failed to advise Plaintiff about the relationship between the current landowner and Cayuga.

81.    Plaintiff relied on Lithen's and Gumpel's advice and agreed to invest in 28 Herbert Street.

82.    Thus, on or about June 20, 2019, Plaintiff entered into a Membership Interest Purchase Agreement ("MPA") in connection with an entity titled CCMAI 28 Herbert LLC.

83.    Pursuant to the MPA, Plaintiff acquired membership in CCMAI 28 Herbert LLC in exchange for a payment of $300,000.

84. In connection with that investment, Cayuga failed to disclose the material fact that Plaintiff was not, in fact, investing into the entity that was "finalizing a joint venture with the current landowner."

85. Unbeknownst to Plaintiff at the time she made her investment, and contrary to Lithen's representations, the entity that was "finalizing a joint venture with the current landowner and should have the site under control within weeks" was actually CCM Management Co-Invest 28 Herbert LLC, not CCMAI 28 Herbert LLC, the interest in which Plaintiff purchased.

86. The Cayuga Defendants and Gumpel failed to advise that there was no actual joint venture agreement with the property owner. Instead, CCM Management Co-Invest 28 Herbert LLC entered into a ground lease with the owner of the subject property, which would convert into a joint venture only upon the happening of a significant contingency: the completion of the construction on the property.

87. Wiseman, as an experienced attorney in "private equity law," knew full well that these facts materially altered Plaintiff's investment risk. However, neither Wiseman, Lithen, Sacks, nor Gumpel advised Plaintiff of the risk.

88. In addition, the Cayuga Defendants and Gumpel should have known, based on their representations, that Plaintiff would rely on them to conduct appropriate due diligence on the investment and recommend a conservative investment, not a high-risk situation like the one in which Plaintiff is now involved.

89. Had Plaintiff been made aware of the ownership arrangement, she would not have purchased the membership interest in CCMAI 28 Herbert LLC.

90. Plaintiff was led to believe, via tax return filings, that she owned a 28% equity interest in the Herbert St. real estate.

91.     After Plaintiff invested in 28 Herbert St, Cayuga sent periodic "updates" to the investors regarding the subject development.

92.      For instance, on Jan. 25, 2021, Cayuga sent an update , informing Plaintiff that the project had "struggles" with the department of buildings, and the value engineering in which Cayuga engaged with its professionals.

93.     Unbeknown to Plaintiff, CCM Management Co-Invest 28 Herbert LLC defaulted on the terms of their ground lease and was sued by the property owner on or about Oct. 21, 2021.

94.     The lawsuit alleged the breach of the lease and sought ejection and termination of the ground lease. In other words, the lawsuit risked a complete loss of the right to develop the subject property.

95.     The Cayuga Defendants did not inform plaintiff that the lawsuit was commenced.

96.     The Cayuga Defendants likewise did not inform Plaintiff that the subject lawsuit was resolved by way of a settlement.

97.     After the litigation was resolved by way of a settlement, Plaintiff was advised that Cayuga "fought a long, complex and expensive legal battle" pertaining to the 28 Herbert Street property, resulting in the loss of Cayuga's right to develop the property and loss of the Plaintiff's interest in her investment. Plaintiff was never made aware of the existence of this "legal battle" or its ultimate effect on her investment during the pendency of that litigation.

98.     Egregiously, even though Cayuga Defendants never made any distributions to Plaintiff with respect to her membership interest, they still indicated on Plaintiff's K-1 statement for 2022 that she received a distribution of $135,540.00, a sum she never received.

99.     Plaintiff requested the accounting and information concerning the litigation, but received <u>no</u> response to either of her requests.

100.    Plaintiff also inquired about the status of the $135,000 which was attributed to her on the K1 statement, but received no response to that request either.

*Plaintiff's Investment in Wyckoff.*

101.    After Plaintiff invested in 28 Herbert St, as discussed above, Cayuga and Plaintiff continued to discuss other investment opportunities.

102.    In that connection, in the late summer of 2019, Plaintiff was presented with an investment opportunity in connection with a mixed-use property located at 287-295 Wyckoff Avenue, Brooklyn (hereinafter "Wyckoff Property").

103.    In accordance with an Executive Summary provided by Cayuga to Plaintiff, prior to the investment, Cayuga announced an opportunity to "place $700,000 in preferred equity on 287-295 Wyckoff Avenue." Plaintiff decided to invest the $700,000 in Wyckoff after being advised by Gumpel and other defendants.

104.    However, shortly thereafter, Cayuga advised that the preferred equity opportunity was not available, but instead, it was seeking a "bridge" loan in connection with this property.

105.    The Cayuga Defendants represented that the loan would be "backed" by the subject building and explained that the loan was a safer investment than the equity.

106.    Plaintiff agreed to loan the funds in connection with the Wyckoff Property.

107.    At all times material hereto, Cayuga caused Plaintiff to believe that she was lending the funds to the owner of the Wyckoff Property.

108.    Plaintiff formed that belief because Lithen, in an email dated Oct. 10, 2019, in offering Wyckoff Property as an opportunity, expressly represented that "We own these buildings, they are 100% leased and cash flowing" and "We have a bridge loan on the property that will be paid off with the proceeds from this financing."

109. In reliance on this representation, Plaintiff chose to invest substantial funds.

110. In October 2019, Plaintiff made the loan in the principal amount of $700,000 to JS-JW Construction Facility LLC, an entity Plaintiff believed was owned the Wyckoff Property.

111. At no point prior to the loan did Lithen, or anyone else on behalf of Cayuga or JS-JW, disclose that JS-JW did not own the subject property.

112. Upon information and belief, JS-JW is an entity affiliated with, and under the control of, Cayuga and some or all of the Cayuga Principals.

113. The loan was to be repaid with interest at the rate of 10% per annum. Interest payments were to be paid quarterly. The final payment of interest and principal was to be paid on July 1, 2022.

114. The note provides for payment by the borrower of the legal costs of collection resulting from non-payment of the note.

115. No payments have been made on the loan since a partial payment for the first quarter of 2021 in the amount of $7,500 total.

116. On or about May 20, 2022, Plaintiff declared a default under the note and has demanded payment in full. However, payment has not been made.

117. Instead, Cayuga responded that it sought to sell the Wyckoff Property and pay Plaintiff's loan in full. To date, Plaintiff has not been paid.

118. Egregiously, at the time of the loan, Cayuga and the Cayuga principals represented to Plaintiff that the loan was "fully backed by the building" and that if the property were sold, Plaintiff would be the first to be paid from the sale proceeds.

119. Recently, however, Plaintiff learned that JS-JW does not, in fact, own the Wyckoff Property.

120. Defendants knew that Plaintiff would not have invested in this property had she known that Defendants did not own or control the building.

121. Plaintiff has asked for financial information on JS-JW, but none has been provided. Thus, Plaintiff is not aware whether or not JS-JW, the entity to which she loaned $700,000, is a shell entity with no assets. This is not the type of secure investment that Plaintiff sought to make, and that Cayuga and the Cayuga principals represented and promised would be made.

122. Plaintiff would not have made the loan to JS-JW had it been made known to her that she was not lending money to the owner of Wyckoff and that she would not be repaid upon sale of Wyckoff.

123. Defendants misrepresented that they "owned" the Wyckoff property and/or failed to disclose that JS-JW did not, knowing that this was a material consideration for Plaintiff in deciding to make the loan.

124. Plaintiff relied on Defendants' representation regarding their ownership of the Wyckoff Property to her detriment.

**<u>COUNT ONE</u>**

**Violation of Section 10 (b) of the Securities Exchange Act and Rule 10b-5 Investment**

**Against all Defendants**

125. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

126. Plaintiff's purchase of a membership interest in CCMAI 28 Herbert LLC constitutes a sale of securities by Defendants to Plaintiff under 15 U.S.C. § 78c(a)(10); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

127. At the time Defendants solicited Plaintiff to purchase the membership interest in connection with CCMIA 28 Herbert LLC, they made material misrepresentations and omissions to Plaintiff as outlined at length above.

128. Those misrepresentations and/or omissions were material.

129. Defendants had actual knowledge of the misrepresentations and omissions made to Plaintiff.

130. At all times, Lithen was an agent of Cayuga.

131. Cayuga was required to supervise the conduct of its agents and their solicitations of investors.

132. Cayuga knew or should have known of the fraudulent conduct by Lithen.

133. Defendants had actual knowledge of misrepresentations and/or omissions of material facts as set forth above, or acted with reckless disregard for their truth.

134. Those representations or omissions were made knowingly or recklessly for the purpose of concealing the true ownership and the relationship with respect to the subject property and inducing Plaintiff to purchase interest in CCMIA 28 Herbert LLC.

135. Plaintiff relied upon those misrepresentations and omissions in entering into the Membership Purchase Agreement.

136. As a result of the foregoing, Plaintiff has incurred and will continue to incur damages.

137. By virtue of the foregoing, Defendants have violated Section 10(b) of the Securities and Exchange Act and Rule 10bb-5 promulgated thereunder.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

A.  Compensatory Damages;

B.  Consequential Damages;

C.  Punitive Damages and Exemplary Damages;

D.  Attorneys' fees, interest, and costs of suit;

E.  Such other relief as this Court may deem just and proper.

## COUNT TWO

### (Violations of Section 20(a) of the Securities Exchange Act)

### Against Cayuga, Wiseman, and Sacks.

138.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

139.    At all relevant times, Cayuga, Wiseman, and Sacks possessed, directly or indirectly, the power to direct and control Lithen and CCMAI 28 Herbert LLC within the meaning of Section 20(a) of the Securities Act.

140.    Cayuga, Wiseman, and Sacks should have known that Lithen and CCMAI 28 Herbert LLC engaged in fraudulent conduct, but failed to take steps to prevent their violation of the securities law.

141.    Cayuga, Wiseman, and Sacks were culpable participants in the fraudulent conduct of Lithen and CCMAI 28 Herbert LLC.

142.    By reason of the foregoing, Plaintiff is entitled to judgment for damages, in an amount to be determined at trial, against Cayuga, Wiseman, and Sacks.

## COUNT THREE

### Breach of Fiduciary Duties

### Against Cayuga, Wiseman, and Sacks

143. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

144. The Cayuga Defendants acted in the capacity of investment advisors for plaintiff and therefore owed her fiduciary duties.

145. In such capacity, they failed to recommend the appropriate investment for plaintiff and instead recommended risky ones, as set forth above.

146. In addition, Sacks and Wiseman were designated as managers of CCMAI 28 Herbert LLC.

147. In their capacity as managers of the CCMAI 28 Herbert LLC, they owed fiduciary duties to Plaintiff.

148. Sacks and Wiseman of 28 Herbert breached their fiduciary duties by

    a. failing to keep Plaintiff informed of the litigation that risked the loss of the company's primary assets;

    b. failing to advise Plaintiff that they did not own the property that the company sought to develop;

    c. otherwise acting in bad faith as set forth in detail above.

149. As a result of the foregoing, Plaintiff and other members of 28 Herbert LLC have incurred and will continue to incur damages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

F. Compensatory Damages;

G. Consequential Damages;

H. Punitive Damages and Exemplary Damages;

I.   Attorneys' fees, interest, and costs of suit;

J.   Such other relief as this Court may deem just and proper.

## COUNT FOUR

## BREACH OF CONTRACT

### (Against JS-JW, )

150.   Plaintiff repeats each allegation of this Complaint as if set forth fully herein.

151.   Pursuant to the terms of the loan agreement and promissory note, Plaintiff lent to JS-JW the sum of $700,000.

152.   Pursuant to the terms of the note, Plaintiff was entitled to interest at the rate of 10% per annum. She is also entitled to recover reasonable costs and expense in connection with the collection and enforcement of the Note.

153.   All sums due under the Promissory Note were required to be paid in full by June 1, 2022.

154.   Defendants breached the terms of the Loan Agreement and Promissory Note by failing to make a full payment of interest which became due on June 1, 2022, and failing to pay any sums thereafter.

155.   Plaintiff has declared a default under the Loan Agreement and Promissory Note.

156.   As a result of Defendants' breach of the Loan Agreement and Promissory Note, Plaintiff has been damaged and seeks damages from Defendants, jointly and severally, in an amount to be proven at trial, but no less that the principal amount due under the Promissory Note, plus interest, costs, disbursements, and attorneys' fees.

WHEREFORE, Plaintiff Josefina Cesarman demands judgment against Defendants for:

A.  Compensatory Damages;

B.  Consequential Damages;

C.  Punitive and Exemplary Damages;

D.  Attorneys' fees, interest, and costs of suit;

E.  Such other relief as this Court may deem just and proper.

## COUNT FIVE

### Breach of the Implied Covenant of Good Faith and Fair Dealing against JS-JW

157.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

158.    The Loan Agreement and Promissory Note are to be interpreted by New York Law.

159.    The Loan Agreement and Promissory note each contained an implied covenant of good faith and fair dealing, as is implied in every contract under New York law.

160.    Defendants' conduct, as set forth above, has deprived and will continue to deprive Plaintiff of her rights to receive benefits of the Loan Agreement into which she entered.

161.    In light of the foregoing, Defendants have breached the implied covenant of good faith and fair dealing.

162.    As a result, Plaintiff has incurred and will continue to incur damages.

WHEREFORE, Plaintiff demands judgment against Defendants for:

F.  Compensatory Damages;

G.  Consequential Damages;

H.  Punitive Damages and Exemplary Damages;

I.  Attorneys' fees, interest, and costs of suit;

J.  Such other relief as this Court may deem just and proper.

## COUNT SIX

## Breach of Contract Against Gumpel

163.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

164.     Under Gumpel's Private Placement Agreement, Gumpel was to be paid $20,000 for his assistance in finding financing opportunities for Plaintiff.

165.     In addition, Gumpel had a duty to exercise due care and diligence while acting as an "agent" on behalf of the Plaintiff, which he failed to do.

166.     Instead, Gumpel is responsible for placing Plaintiff in an investment not suited to her needs, and because of his lack of due diligence, his advice and counsel have caused Plaintiff to lose her investment.

167.     In addition, the portion of Gumpel's $20,000 was required to be refunded to Plaintiff once she invested the funds.

168.     Plaintiff did invest the funds as required under the contract, but Gumpel never repaid the portion of the funds as he was required.

169.     His failure to repay the funds due under the contract constitutes a material breach thereof.

As a result of the foregoing, Plaintiff has incurred and will continue to incur damages.

WHEREFORE, Plaintiff demands judgment against Defendant Gumpel, for:

 K.  Compensatory Damages;

 L.  Consequential Damages;

 M. Punitive Damages and Exemplary Damages;

 N.  Attorneys' fees, interest, and costs of suit;

 O.  Such other relief as this Court may deem just and proper.

## COUNT SEVEN

### Broker Negligence Against Gumpel.

170.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

171.     Gumpel held himself out as having expertise in the area of real estate investment.

172.     Instead, Gumpel acted negligently and recommended to Plaintiff an investment not suitable to her needs.

173.     Because of his lack of due diligence, his erroneous and negligent advice and counsel have caused Plaintiff to lose her investment.

As a result of the foregoing, Plaintiff has incurred and will continue to incur damages.

WHEREFORE, Plaintiff demands judgment against Defendant, for:

P.   Compensatory Damages;

Q.   Consequential Damages;

R.   Punitive Damages and Exemplary Damages;

S.   Attorneys' fees, interest, and costs of suit.

## COUNT EIGHT

### Breach of Fiduciary Duties Gumpel

174.     Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

175.     Defendants orchestrated an elaborate scheme, pursuant to which they took Plaintiff's money in the form of a loan and an equity interest with the representation that her investment would be utilized to purchase a direct interest in real estate. Instead, through this

scheme, the monies were taken by entities that had no interest in title to real estate and may very well have been assetless, but for the monies advanced by Plaintiff.

176.     In accordance with New York Real Estate Law, Article 12-1, the law requires that all real estate brokers and salesperson receive a license from the State.

177.     In accordance with applicable law, the remedies available to a party injured by a real estate broker's failure to be licensed are monetary damages or restitution of property.

178.     Accordingly, Plaintiff is entitled to a judgment determining that said contracts are deemed rescinded and directing Defendants to return to Plaintiff all monies that Plaintiff paid them along with any interest, costs, and attorney's fees.

179.     Plaintiff is entitled to restitution of her property obtained through the actions of Gerber or monetary damages as a result thereof.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

T.  Compensatory Damages;

U.  Consequential Damages;

V.  Punitive Damages and Exemplary Damages;

W. Attorneys' fees, interest, and costs of suit;

X.  Such other relief as this Court may deem just and proper.

## COUNT NINE

### Fraud in the Inducement Against all Defendants

180.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

181.    Defendants orchestrated an elaborate fraudulent scheme pursuant to which they took Plaintiff's money in the form of loan and/or equity interest by making representations that were untrue to induce Plaintiff to invest funds with Defendant.

182.    More specifically, Gumpel represented that he has a particular and specialized knowledge of real estate and investment in order to induce Plaintiff to retain him as her "agent" for the purposes of securing real property investments in New York.

183.    Cayuga defendants misrepresented that they owned the properties in which Plaintiff was investing even though they knew that representation to be false.

184.    The Defendants concealed from the plaintiff the material information in connection with the ownership of the properties and entities in which plaintiff was investing.

185.    The above representations were material.

186.    Defendants made those representations knowing that Plaintiff would rely on them intending to defraud her.

187.    Plaintiff reasonably relied on those material misrepresentations when she chose to invest her funds with Defendants.

188.    Plaintiff sustained damages as a result of Defendants' misrepresentations.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

Y.  Rescission of the agreements and return of all funds paid by Plaintiff to Defendants.

Z.  Compensatory Damages;

AA.    Consequential Damages;

BB.    Punitive Damages and Exemplary Damages;

CC.    Attorneys' fees, interest, and costs of suit;

DD.    Such other relief as this Court may deem just and proper.


## COUNT TEN

### Unjust Enrichment Against All Defendants

189.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

190.    Defendants made material misrepresentations or omissions to Plaintiff in that they represented to her that she was acquiring a record interest in real estate, which was false.

191.    Defendants made these representations to Plaintiff with knowledge of the falsity thereof.

192.    Defendants made these representations to Plaintiff with the intent to defraud Plaintiff.

193.    Plaintiff reasonably relied on Defendants' misrepresentations that she was acquiring an interest in real estate.

194.    Defendants were unjustly enriched as a result of their misrepresentations, jointly and severally, in an amount to be proven at trial, but no less that the amount of $1,000,000, the total amount of Plaintiff's investments, plus interest, costs, disbursements, and attorneys' fees.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

EE. Compensatory Damages;

FF. Consequential Damages;

GG.    Punitive Damages and Exemplary Damages;

HH.    Attorneys' fees, interest, and costs of suit;

II.  Such other relief as this Court may deem just and proper.

Dated: June 15, 2023
New York, New York

Respectfully submitted,

NORRIS McLAUGHLIN, P.A.

By:    /s/ Edward G. Sponzilli
Edward G. Sponzilli, Esq.

Attorneys for Plaintiff
7 Times Square, 21st Fl.
New York, NY 10036-6524
Telephone:  212-808-0700
Facsimile:  212-808-0844

# EXHIBIT A

# INVOICE

*Zachary R. Gumpel Independent Consulting*

**Zachary R. Gumpel**

803 Wyckoff Ave. Unit#4L

Ridgewood, NY, ZIP 11385

347.609.8548

zgumpel@gmail.com

Josephine Cesarman

c/o Marlon Maus

2016 Etna St.

Berkeley, CA, 94704

Phone

**Invoice No :** 1

**Date :** 12/6/2018

**Customer ID :** MMAUS

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| Zachary Gumpel | Capital Placement | Due upon receipt | 12/6/2018 |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Capital Placement Fee | $20,000.00USD | $ 20,000.00 |

| | | |
|---|---|---|
| Subtotal | $ | 20,000.00 |
| **TOTAL** | $ | 20,000.00 |

Make all checks payable to Zachary R. Gumpel .

THANK YOU FOR YOUR BUSINESS!

# EXHIBIT B

 

Applicants are required to submit an e-mail address that will be used by the Department to communicate with you regarding your account or any licensing issues. **Failure to respond to an email notice from the Department may prevent you from conducting business and/or result in disciplinary action**. Please update your personal information whenever necessary.

*Logon*

## License Details

Press "Search Results" to return to the Search Results list.

Press "New Search Criteria" to do another search of this type.

Press "New Search" to start a new search.

| | |
|---|---|
| Name: | **Zachary R Gumpel** |
| License Type: | **Limited Liability Company Broker:LL Comp Broker** |
| License Number: | ▮▮▮▮▮▮ |
| License Status: | **Current** |
| Expiry Date: | **11/03/2023** |

**Addresses**

| **Practice Locate – Limited Liability Company Broker** | Address: | **77 CORNELL ST STE 408 KINGSTON , NY ULSTER 12401 US** |
|---|---|---|

**Relation(s)**

| Related Party Name | License Type | Address | License Expiry Date |
|---|---|---|---|
| HRH DEVELOPMENT BROKERS LLC | Principal Office:Princ Off | 77 CORNELL ST STE 408 KINGSTON , NY ULSTER 12401 US | |

|                    Search Results | New Search Criteria | New Search |
|---|

| DOS Home | Site Map | Privacy Policy | Accessibility Policy | Contact Us |

# EXHIBIT C

**October 25th, 2019**


Josefina Cesarman
c/o Marlon Maus,
2016 Etna St,
Berkeley, CA 94704
Phone 510-292-5154


RE:     Private Placement of Capital on Behalf of Josefina Cesarman for CCM (Cayuga
Capital Management) Limited partner stake in property located at 287-295 Wyckoff Ave
Ridgewood, NY 11385


Dear Marlon:

This letter confirms our understanding that you, Josefina Cesarman, has engaged Zachary
R. Gumpel to act as a placement agent on your behalf in connection with a best efforts
private placement. This letter will confirm your acceptance and set forth the terms of the
engagement agreed to between you (Josefina Cesarman) & Zachary R. Gumpel.

1.     Information. In connection with the Placement Agent's activities
       hereunder, the Company (CCM) furnished all material and information
       regarding the business and financial condition of the (the
       "Information").  Zachary R. Gumpel represents and warrants that all
       Information provided will be complete and correct in all material will
       not contain any untrue statement of a material fact or omit to
       state a material fact necessary in order to make the statements therein not
       misleading. recognizes and confirms: (i) will use and rely primarily on the
       Information and on information available from generally recognized public
       sources performing the services contemplated
       by this letter without having independently verified the same; (ii) does
       not assume responsibility for the accuracy or completeness of the
       Information and such other information.



2.     Compensation. As compensation for services rendered and to be rendered
       hereunder by Zachary R. Gumpel, Josefina Cesarman agrees to pay Zachary R. Gumpel as
       follows:

       a)     An amount in cash equal to zero point seven one percent (.71%) or five thousand dollars
              ($5,000.00 USD) of the principal amount of seven hundred thousand dollars ($700,000.00
              USD) of placed and/or
              committed by any of the investors listed in Exhibit A hereto, payable
              upon final introduction.

       b)     Capital contribution to CCM of six hundred eighty two thousand and five hundred dollars
              ($695,000.00 USD) will be treated as a seven hundred thousand dollar ($700,000.00 USD)
              contribution. This placement fee of (.71%) although paid by         Josefina Cesarman will be
              offered in the form of a (.71%) rebate
              upon final execution of capital contribution agreement with CCM (Cayuga Capital Management).

       c)     Zachary R. Gumpel will reimburse Josefina Cesarman in a timely manner
              If the capital contribution does not take place. Placement fee will be held in a Capital one  account & will

remain until capital placement has been completed & verified by both parties CCM (Cayuga Capital Management) & Josefina Cesarman. Upon signed delivery of capital placement fee contract bank Deposit is to be executed via wire using information as follows: Acct# 36061918495 Rt#031176110

3.   Non Disclosure of Confidential Information. Parties will not disclose any confidential information received from the other party to others except with the written permission of the other party or as such disclosure may be required by law.

4.   Counterparts. For the convenience of the parties, this Agreement may be executed in any number of counterparts, each of which shall be, and shall be deemed to be an original instrument, but all of which taken together shall constitute one and the same Agreement. If the terms of our engagement as set forth in this letter are satisfactory to you, please sign and date the enclosed copy of this letter.

Very truly yours,

Zachary R. Gumpel

By: _____

Placement Agent: Zachary R. Gumpel

ACCEPTED AND AGREED TO: as of the date hereof:  10-28-2019

By: _____

Josefina Cesarman

# EXHIBIT D

# <u>Cayuga Capital Management LLC</u>



Brooklyn-Based Real Estate
Developer and Manager



# CAYUGA CAPITAL MANAGEMENT LLC
## Firm Overview

### Overview

Cayuga Capital Management LLC "CCM" is a privately owned real estate operating partner, developer, and property manager with over $800mm in operating and development properties under management. CCM currently has approximately 100 high net worth and institutional clients including Arel Capital, CDP America, and RiverOak Investment Corp.  CCM was founded in 2004 by partners Jacob L. Sacks and James P. Wiseman, and is located in New York City.

### Investment Thesis

CCM seeks to identify properties not operated at their best and highest potential and invests to maximize returns.  CCM achieves this through repositioning the property, renovation, or ground up construction. CCM currently targets multi-family and retail conversion opportunities in mixed-use, walkable neighborhoods with excellent access to public transportation that demonstrate improving residential and retail demand as well as constrained supply characteristics.

### Brooklyn Expertise

CCM is a significant real estate holder in Brooklyn, New York, helping transform and grow the neighborhood for over a decade. CCM currently owns approximately 450 apartment units and almost 450,000 SF of commercial space in Brooklyn, making it one of the largest commercial developers in Williamsburg and one of the largest residential property managers in Bushwick.

### Principals

Jacob L. Sacks and James P. Wiseman have worked together acquiring, developing, and operating real estate for over 13 years and have known each other for over 20 years. Together, the principals have over 32 years of experience in private equity law, investment banking, hedge fund administration, and private equity investment into real estate.



# CAYUGA CAPITAL MANAGEMENT LLC
## Firm Overview

## Current Portfolio

Total Properties: 39
Commercial Square Feet: 430,000
Residential Units: 450
Operating Businesses: 2

### Accumulated Acquisition Values



$190mm

### Number of Acquisitons



### Square Foot Growth



The above graphs include properties that CCM has sold.

# CAYUGA CAPITAL MANAGEMENT LLC
## Current Portfolio Snapshot

### Square Feet Under Management - Type



Multifamily, 191,710
Commercial, 368,514
Multifamily with Retail, 255,358

### Properties Under Management - Type



Commercial, 11
Multifamily, 20
Multifamily with Retail, 8

### Square Feet Under Management - Location



Williamsburg, 376,400
Bushwick, 392,624
Ridgewood, 4,500
Greenpoint, 16,200
East New York, 20,200
Cypress Hills, 5,658

### Properties Under Management - Location



Williamsburg, 6
Ridgewood, 1
Greenpoint, 1
East New York, 1
Cypress Hills, 1
Bushwick, 29

4



# CAYUGA CAPITAL MANAGEMENT LLC
## Investment Process

CCM believes its excellent risk-adjusted returns are based on a disciplined and proven investment process in which the firm:



**Identify Deep Value Situations**

**In-House Acquisition Analysis**

**Design and Develop Properties**

**In-House Asset Management Team**

**Leverages** its informational advantage based on research, analytics, due diligence and large circle of contacts to identify compelling, deep-value situations.

**Mobilizes** its in-house acquisition and development team to structure, design, and optimize each investment. If the investment meets CCM's criteria, CCM's acquisition team will then place an offer.

**Secures** construction and permanent debt at competitive rates through its wide developed network of institutional lenders and debt brokers. CCM will then carry out its development plan.

**Maintains** asset management in-house to ensure highest returns with self-reinforcing 'street-level' data further contributing to CCM's informational advantage.



## Value Creation



**VALUE**

**Tax Strategies**
- 421(a) Governmental Program
- Industrial Commercial Abatement Program ("ICAP")
- 1031 Exchanges

**Repositioning**
- Change of Use to Maximize Profits
- Minor Renovations to rapidly improving areas

**New Development**
- Gut Renovation Conversions
- Ground up Construction

# CAYUGA CAPITAL MANAGEMENT LLC
## Why Invest with CCM?

**Proven Track Record**

Since inception, CCM has created approximately $250 million in profit for its investors and has an average gross IRR of 29% on its exited projects, demonstrating its ability to identify deep value situations and successfully execute them.

**Access to Brooklyn**

Brooklyn is a rapidly growing market with high investor demand. This coupled with its fragmented players and limited supply can make it difficult to access to outside investors.

**Experience**

CCM has over 13 years of experience in Brooklyn real estate, being exposed to different market cycles and successfully repositioning and managing multiple types of real estate totaling over $800 million.

**Alignment of Interests**

CCM's partners invest their own capital into each deal alongside their investor's, providing long-term alignment of interests.



# CAYUGA CAPITAL MANAGEMENT LLC
## Brooklyn Expertise

## CCM's Proven Track Record

- CCM was an early investor in Brooklyn real estate and has over 14 years of experience in the borough
- Total of over 45 properties with 515 residential units and 480,000 SF of commercial space in transactions since inception[1]
- One of the largest commercial developers in Williamsburg
- One of the largest Bushwick residential property managers

## CCM's Returns

|  | Exited Projects | Current Projects |
|---|---|---|
| Average Gross IRR | 56% | 24% |
| Average Multiple on Capital | 2.6 | 3.6 |
| Average Net Proceeds | $5.6mm | $9.9mm |

## Map of CCM's Brooklyn Footprint



[1] Includes properties that CCM has sold.

8



# CAYUGA CAPITAL MANAGEMENT LLC
## Bushwick Residential Projects – Totaling 355 Units

1) 184 Noll Street — *32 Units*
2) 36 Wilson Avenue — *5 Units*
3) 324 Melrose Street — *8 Units*
4) 311 Troutman Street — *8 Units*
5) 297 Troutman Street — *8 Units*
6) 285 Troutman Street — *5 Units*
7) 304 Troutman Street — *5 Units*
8) 147 Starr Street — *8 Units*
9) 842 Hart Street — *6 Units*
10) 220 Suydam Street — *6 Units*
11) 286 Stanhope Street — *23 Units*
12) 241 Himrod Street — *6 Units*
13) 248 Himrod Street — *6 Units*
14) 290 & 294 Harman Street — *24 Units*
15) 1399 Greene Avenue — *6 Units*
16) 369 Menahan Street — *6 Units*
17) 287–295 Wyckoff Avenue — *18 Units*
18) 600 Bushwick Avenue — *64 Units*
19) 626 Bushwick Avenue — *99 Units*
20) 124 Linden Street — *6 Units*
21) 1324 Halsey Street — *6 Units*





# CAYUGA CAPITAL MANAGEMENT LLC

## Williamsburg Retail Properties – Totaling over 135,000 SF of Retail

① **1 Nassau Avenue**
*31,000 SF*



② **10 Berry Street**
*24,800 SF*



③ **74 Wythe Avenue**
*7,400 SF*



④ **87 Wythe Avenue**
*45,000 SF*



⑤ **76 N 4th Street**
*27,000 SF*



⑥ **115 Broadway**
*1,500 SF*





*Square feet represents gross retail footprint only.*



# CAYUGA CAPITAL MANAGEMENT LLC
## Track Record

*CCM has a proven track record of creating value from real property investments by combining research and analytics, development, and asset management into a virtuous cycle, enabling for greater value extraction from each component of the cycle*



Realized Annualized Returns



Value Creation



Unrealized Annualized Returns

Returns are shown at the project level. Return Values for unsold properties assume the sale of the property at a price based on bank valuations, comparable properties, previous offers, and management's judgment, and assumes a 5% closing cost. Past performance is not a guide to future results. Returns are not guaranteed. *S&P 500* returns were sourced from https://dqydj.com/sp-500-return-calculator/ and assumes dividends were reinvested. *Real Estate* returns are the FTSE NAREIT Equity Diversified Index.





Return Values for unsold properties assume the sale of the property at a price based on bank valuations, comparable properties, previous offers, and management's judgment, and assumes a 5% closing cost.  Past performance is not a guide to future results.  Returns are not guaranteed.

# CAYUGA CAPITAL MANAGEMENT LLC
## Track Record – Realized Returns

- CCM has achieved a median IRR of 23% on its exited projects.

| Investment | Purchase Date | Purchase Price | Sale Price | Sale Date | Initial Equity | Net Proceeds | Gross IRR | Equity Multiple for investment period | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | Investment | iShares US Real Estate ETF [1] | iShares Core S&P 500 ETF[1] |
| 768 Hart Street | May 2005 | $515,000 | $1.480.000 | January 2007 | $300,000 | $750,000 | 73% | 2.50 | 1.65 | 1.28 |
| 44 Berry Street | November 2007 | $12,650,000 | $27,204,108 | May 2011 | $6,150,000 | $9,400,000 | 12% | 1.54 | 1.13 | 1.06 |
| 893 Bergen Street | February 2009 | $150,000 | $1,250,000 | September 2013 | $300,000 | $1,200,000 | 68% | 4.09 | 2.44 | 2.26 |
| 440 Irving Avenue | June 2007 | $580,000 | $1,275,000 | January 2014 | $175,000 | $525,000 | 19% | 3.14 | 1.06 | 1.41 |
| 74 Wythe Avenue | December 2012 | $1,750,000 | $7,400,000 | May 2014 | $1,600,000 | $5,759,000 | 198% | 3.60 | 1.18 | 1.40 |
| 44 Kent | September 2012 | $5,207,000 | $8,700,000 | July 2014 | $6,000,000 | $8,000,000 | 16% | 1.32 | 1.19 | 1.41 |
| 79 Quay Street | June 2013 | $6,500,000 | $16,000,000 | July 2016 | $6,500,000 | $15,200,000 | 32% | 2.34 | 1.40 | 1.40 |
| 6 Building Portfolio | June 2013 | $4,664,200 | $8,000,000 | January 2017 | $2,085,000 | $4,057,000 | 26% | 1.95 | 1.33 | 1.49 |
| 618 Bushwick Avenue | January 2012 | $4,100,000 | $51,000,000 | September 2017 | $10,000,000 | $21,000,000 | 19% | 2.10 | 1.74 | 1.21 |
| 97-20 Rockaway Blvd. | September 2012 | $1,399,325 | $2,380,000 | October 2017 | $683,000 | $683,000 | 0% | 1.00 | 1.49 | 2.04 |

[1]Source: www.iShares.com



# CAYUGA CAPITAL MANAGEMENT LLC
## Track Record – Unrealized Returns

**CCM Property Funds**

| Investment | Initial Funding Date | Initial Equity | Number of Properties | Investment Type | Capital Paid to Date | Equity Multiple[1] | Gross IRR[1] |
|---|---|---|---|---|---|---|---|
| CCM Property Fund II | January 2006 | $357,000 | 2 | Residential | $2,240,000 | 9.6 | 32% |
| CCM Property Fund III | July 2007 | $3,400,000 | 7 | Mixed Use Residential | $4,540,000 | 2.4 | 11% |

**CCM Operating Properties**

| Investment | Purchase Date | Purchase Price | Neighborhood | Investment Type | Project Capitalization | Equity Multiple | Gross IRR[1] |
|---|---|---|---|---|---|---|---|
| 184 Noll Street | January 2008 | $2,000,000 | Bushwick, Brooklyn | Mixed Use Residential | $11,000,000 | 2.9 | 17% |
| 234 Starr Street | November 2010 | $1,720,100 | Bushwick, Brooklyn | Commercial | $5,075,000 | 2.26 | 20.1% |

[1]Return Values assume the sale of the property at a price based on bank valuations, comparable properties, previous offers, and management's judgment, and assumes a 5% closing cost. Past performance is not a guide to future results. Returns are not guaranteed.

14



# CAYUGA CAPITAL MANAGEMENT LLC
## Track Record – Unrealized Returns (cont.)

| Investment | Purchase Date | Purchase Price | Neighborhood | Investment Type | Project Capitalization | Equity Multiple | Gross IRR[1] |
|---|---|---|---|---|---|---|---|
| 286 Stanhope Street | February 2008 | $1,525,000 | Bushwick, Brooklyn | Mixed Use Residential | $8,610,000 | 3.70 | 20.3% |
| 290 & 294 Harman Street | October 2014 | $6,000,000 | Bushwick, Brooklyn | Residential | $7,175,000 | 1.62 | 28.8% |
| 324 Melrose Street | October 2007 | $550,000 | Bushwick, Brooklyn | Residential | $2,950,000 | 2.12 | 11.3% |
| 723 Van Sinderen Avenue | January 2015 | $2,150,000 | East New York, Brooklyn | Commercial | $2,150,000 | 3.68 | 60.5% |
| 76 N 4th Street | October 2010 | $15,900,000 | Williamsburg Brooklyn | Mixed Use Residential | $48,740,000 | 4.75 | 38.8% |
| 87 Wythe Avenue | December 2013 | $44,500,000 | Williamsburg, Brooklyn | Commercial | $115,000,000 | 2.35 | 33.9% |

[1]Return Values assume the sale of the property at a price based on bank valuations, comparable properties, previous offers, and management's judgment, and assumes a 5% closing cost.  Past performance is not a guide to future results.  Returns are not guaranteed.



# CAYUGA CAPITAL MANAGEMENT LLC
## Debt Experience

- Current Debt on CCM's Portfolio:  $200mm
- Loans CCM Anticipates in the Near Future:  $174mm

### Debt on Operating Properties

| | |
|---|---|
| 3 Building Portfolio | $26.0mm |
| 76 N 4th Street | $25.2mm |
| 8 Building Portfolio | $15.5mm |
| 290 & 294 Harman | $6.1mm |
| 6 Building Portfolio | $5.8mm |
| 287 – 295 Wyckoff | $5.2mm |
| 22-28 Wyckoff | $3.0mm |
| 234 Starr Street | $2.9mm |
| 285 Troutman Street | $1.5mm |
| 319 Scholes Street | $1.5mm |
| 723 Van Sinderen | $1.4mm |
| 53 Arlington | $.9mm |

**TOTAL:  $95mm**

### Debt on Development Properties

| | |
|---|---|
| 600 Bushwick Avenue | $34.0mm |
| 87 Wythe Avenue | $22.5mm |
| 626 Bushwick Avenue | $19.2mm |
| 321 Starr Street | $14.5mm |
| 199 Starr Street | $7.3mm |
| 144 Greenpoint | $5.0mm |
| 115 Broadway | $1.5mm |

**TOTAL:  $104mm**

### Anticipated Debt

| | |
|---|---|
| **87 Wythe Avenue** | **$100mm** |
| **10 Berry Street** | **$28mm** |
| **199 Starr Street** | **$22mm** |
| **1 Nassau Avenue** | **$19mm** |
| **115 Broadway** | **$5mm** |

**TOTAL:  $174mm**



# CAYUGA CAPITAL MANAGEMENT LLC
## Exited Investments



**768 Hart Street Brooklyn, NY**
4,500 SF Residential
5 Units

**January 2007**
CCM sells the
final condo for a
total of $1.5mm

**May 2005**
CCM purchased the
building for $499k

**October 2006**
The building was
converted to
condominiums

**Condo Conversion**
Initial Equity Investment:
$300k
Net Proceeds After Sale:
$750,000
Hold Period: 1.8 years
Equity Multiple: 2.50x
Realized Gross IRR: 73%



**44 Berry Street Brooklyn, NY**
45,000 Total SF
42 apartment units and 11,000 retail SF

**November 2007**
CCM purchased the empty
warehouse for $12.65mm

**June 2009**
CCM completes development
and begins leasing the
building

**May 2011**
CCM sells the
property for
$27mm

**Mixed-Use Development**
Initial Equity Investment:
$6.15mm
Total Costs: $11.5mm
Net Proceeds After Sale:
$9.2mm
Hold Period: 3.5 years
Equity Multiple: 1.54x
Realized Gross IRR: 12%



# CAYUGA CAPITAL MANAGEMENT LLC

## Exited Investments



**893 Bergen Street Brooklyn, NY**
7,000 SF Industrial Building

**February 2009**
CCM purchased the
building for $150k

**October 2009**
$300k returned to investors
from refinancing proceeds

**September 2013**
CCM sells the
property for
$1.25mm



**July 2009**
Renovations completed and
property is leased

**Commercial Retrofit**
Initial Equity Investment:
$300k
Total Costs: $150k
Net Proceeds After Sale:
$887,500
Hold Period: 4.6 years
Equity Multiple: 4.09x
Realized Gross IRR: 68%



**74 Wythe Avenue, Brooklyn, NY**
11,400 SF Commercial Property

**December 2012**
CCM purchased the
property for $1.58mm

**May 2014**
CCM sells the
property for
$7.4mm

**2013**
CCM distributes
$750k to investors

**Commercial Retrofit**
Initial Equity Investment:
$1.75mm
Total Costs: $1.8mm
Net Proceeds After Sale:
$5.2mm
Hold Period: 1.5 years
Equity Multiple: 3.11x
Realized Gross IRR: 123%



# CAYUGA CAPITAL MANAGEMENT LLC
## Development Projects



**87 Wythe Avenue**
**Williamsburg, Brooklyn**

**Status:** In Development
**Type:** Retail and Office
**Project Size:** 191,000 SF
**Expected Completion:** 2019



**1 Nassau Avenue**
**Williamsburg, Brooklyn**

**Status:** Pre-Development
**Type:** Retail and Office
**Project Size:** 32,000 SF
**Expected Completion:** 2019



**10 Berry Street**
**Williamsburg, Brooklyn**

**Status:** Pre-Development
**Type:** Retail and Office
**Project Size:** 21,500 SF
**Expected Completion:** 2019



**115 Broadway Street**
**Williamsburg, Brooklyn**

**Status:** Pre-Development
**Type:** Retail and Office
**Project Size:** 5,000 SF
**Expected Completion:** 2019



# CAYUGA CAPITAL MANAGEMENT LLC
## Development Projects (cont.)



**199 Starr Street**
**Bushwick, Brooklyn**

**Status**:  Construction
**Type**:  Retail
**Project Size:**  20,700 SF
**Expected Completion:**  2018



**321 Starr Street**
**Bushwick, Brooklyn**

**Status**: Construction
**Type**:  Retail and Office
**Project Size:**  25,000 SF
**Expected Completion**: 2018



**600 Bushwick Avenue**
**Bushwick, Brooklyn**

**Status:** Construction
**Type**:  Retail and Residential
**Project Size**: 64 Units and
12,000 SF of Retail
**Expected Completion:**  2018

